## City of Chicago et al. v. University of Chicago.

### Gen. No. 13,004.

1. WATER RATES—*power of municipal corporation to grant exemption from payment of.* It is within the power of a municipal corporation to exempt educational and other like institutions from the payment of water rates.

2. ORDINANCE—*granting exemption to educational institutions from payment of water rates construed.* Held, that the ordinance in question in this case, which exempted educational and other like institutions from the payment of water rates, with respect to buildings used in the immediate conduct and carrying on of the educational purposes of such institutions, included dormitories and commons, for the use and enjoyment of which fees were charged by such institution.

3. CERTIFICATE OF EVIDENCE—*effect of absence of.* Where there is no certificate of evidence in the record, the Appellate Court on review will presume that the facts found by the chancellor were supported by sufficient evidence.

Bill for injunction. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the March term, 1906. Affirmed. Opinion filed February 7, 1907.

**Statement by the Court.** August 5, 1903, appellee filed a bill and subsequently a supplemental bill against appellants to restrain them from collecting water rates from appellee, and cutting off the water from its premises, etc. Appellants answered the bill and supplemental bill, and such proceedings were had that the court rendered a decree sustaining the bill and supplemental bill and restraining appellants as prayed. The appeal is from this decree. The appellee, the University of Chicago, owns quite a large connected body of land in the city, on which are situated numerous buildings claimed by appellee to be used for the educational purposes of the University. May 19, 1902, the City of Chicago adopted an ordinance amendatory of the rules and regulations prescribed by the department of public works of the city, which ordinance went into force in the year 1902, and section 24 of which is as follows:

"The commissioner of public works is hereby directed and instructed to remit and cancel all water taxes and rates heretofore levied and assessed, or which may hereafter be levied or assessed against such property of any charitable, religious or educational institution within the city of Chicago as is used in the immediate conduct and carrying on of the charitable, religious or educational purposes of such institution; provided the commissioner of public works may require every applicant for a rebate or remission of said water rates or taxes to be verified by an affidavit of one or more taxpayers of the city of Chicago."

This section remained in force till March, 1905, when the city adopted a revised code of the city ordinances, section 2402 of which is as follows:

"Exemption—Charitable, religious and educational institutions.

"The commissioner of public works shall remit and cancel all water rates and charges heretofore levied and assessed, or which may hereafter be levied and assessed against such property of any charitable, religious or educational institution in the city as is used

in the immediate conduct and carrying on of the charitable, religious or educational purposes of such institution, and which is not used for gain or profit, or rented, conducted, maintained or operated for the purpose of producing revenue for such institution."

The supplemental bill sets up this section 2402, it having been passed after the filing of the original bill. Section 2402 of the municipal code is substantially the same as section 24 above quoted, except that section 2402 concludes with the words "and which is not for gain or profit, or rented, conducted, maintained or operated for the purpose of producing revenue for such institution."

It is averred in the original bill and admitted in the answer, that appellee is incorporated under the general incorporation law, chapter 32 of the Revised Statutes, for the purpose of maintaining and conducting an institution of learning, but not for private gain or profit.

The only error assigned is that the court erred in rendering a decree in favor of the defendant. The decree commences by finding, generally, that all the material allegations of the bill and supplemental bill have been fully proved, and then finds that the City of Chicago owns and operates an extensive water works plant, for supplying water to the people and institutions of the city; that the city, May 19, 1902, passed section 26, above quoted, quoting the section, and that the same was in full force and effect until March, 1905, when the city passed section 2402 of the municipal code, quoting the section as heretofore quoted; and finding that, under and in accordance with said sections, the city is not accustomed to collect, and does not collect, from other educational institutions within the city, any charges for water used upon property employed in the immediate conduct of their purposes, and has remitted all such charges for water to other educational institutions than complainant. The decree then proceeds as follows:

"The claimant, The University of Chicago, here-after referred to as 'the University,' is a corporation created and existing under the general incorporation act of the State of Illinois, commonly known as chapter 32 of the revised statutes of said state, for the purpose of maintaining and conducting an educational institution, but not for private gain or profit; said complainant was incorporated for the purpose of and ever since its incorporation has been and is now maintaining and carrying on such an educational institution commonly known as a University. The campus of this University is situated within the city upon the blocks bounded by Fifty-seventh and Fifty-ninth streets and Madison avenue on the east, and Cottage Grove avenue on the west, also the blocks bounded by Fifty-sixth and Fifty-seventh streets and Lexington avenue on the east, and Ellis avenue on the west. The ground in this campus is all owned in fee simple by the complainant, and the main buildings of the institution are located upon it. It forms one connected body of land.

That complainant's educational institution has become very expensive, there being commonly in attendance thereupon students to the number of about five thousand (5,000). That about twenty-nine per cent. of said students are residents of the city. The premises and buildings against which the water taxes and rates in question are levied are all owned by complainant in fee simple, are all used by complainant in the immediate conduct and carrying on of its said educational institution, and are all situated within said University campus. The University of Chicago and also like institutions throughout the United States all customarily furnish dormitories and dining halls for the use of their students, and all have the residences of their presidents located near the main college buildings. The board of trustees and faculty and congregation of the University of Chicago (which are the bodies having charge of this University) have always consid-

ered it necessary for the proper carrying on of the University that the buildings against which the water taxes and rates in question in this suit are levied, be furnished for the students and be located together, and they also deem it advisable and for the best interests of the University and its students and their mental, moral and physical training, that the students, so far as possible, live together in dormitories provided for them, and also take their meals in a common dining hall or room, hereinafter described and known as the 'Commons.' All of the buildings in question are convenient for and are arranged for the proper carrying on of the institution.

That complainant's educational institution was created and established exclusively by voluntary contributions and endowments, and is not and has not been at any time conducted for private gain or profit, but solely and only for the improvement and education of its students. The cost of conducting so large an institution is very great, and in order to furnish a part of such cost, certain fees and charges for tuition and room rent are collected from the students. Such fees and charges so collected from the students are wholly insufficient to pay the great cost of the institution, and each year it is necessary to solicit and procure from persons interested in education a very large amount of money to make up the difference between the cost of operating the institution and the aggregate of fees collected from the students. Said annual deficit between the cost of operating the institution and the amount paid by students exceed seven hundred thousand dollars.

That said city now insists that complainant owes and is in arrears to the city for over twenty-eight hundred dollars ($2,800) of water taxes and rates for water supplied to various of its buildings hereinafter described, the bills for which are attached to the bill of complaint herein.

That the city, through its said superintendent of

water, and its agents, has threatened and now is threatening to cut off the water from said premises unless the said bills are paid at once. The cutting off of the water from said premises would cause the complainant very great loss and damages which would not be ascertainable or determinable at law, and which would be irretrievable, as alleged in paragraph 6 of the bill of complaint herein. The complainant, previous to the commencement of this suit, applied to the commissioner of public works of the city for a rebate of the water taxes and rates in question in this suit, its application being verified by the affidavits of one or more taxpayers of the city.

That complainant, owing to its rapid growth, has found it necessary to purchase a large amount of property whereon to erect in the future buildings necessary to its purposes. Among its purchases are a large number of buildings which are used for private purposes, and are at present rented out by complainant to various tenants. Upon all of complainant's said properties which are so rented out, it has at all times paid all water taxes, in accordance with the ordinances of the city, and to the same extent as private owners, and there are no water taxes or water rates due from complainant to the city from any of said properties which are so, as aforesaid, rented out to other parties.

That the only premises and buildings against which the water taxes and rates in question in this suit have been levied are known and described as hereafter set forth, and are, respectively, used by the University in the manner and exclusively for the purposes hereinafter set forth, and are not used for gain or profit, or rented, conducted, maintained or operated for the purpose of producing revenue for complainant's educational institution.

#### CHARLES HITCHCOCK HALL.

This is a dormitory occupied by men students at-

tending the University, and for no other purpose. The rooms in this dormitory are used as living, study and sleeping rooms by such men students, section one of said building being used as training quarters by the division of physical culture and athletics.

### SNELL HALL.

This building also is used as a dormitory exclusively for men students at the University, in the same way as Hitchcock Hall, excepting that it contains no training quarters.

### ANATOMY BUILDING.

This is used by the University for the instruction of students in the science of anatomy and other medical subjects, the building containing laboratories, libraries, lecture rooms, etc., used for these purposes.

### PHYSIOLOGY BUILDING.

This is used by the University for instruction in the study of physiology and other medical subjects.

### KENT LABORATORY.

This contains laboratories and lecture rooms used by the University in the investigation of and instruction in the science of chemistry. It also contains a large assembly hall called 'Kent Theatre,' used for student debates and other student contests, exhibitions, entertainments and meetings, all of which are carried on under the auspices of the University as a part of the University educational work. Kent Theatre is also sometimes used for the reception of University guests and as a lecture room in student subjects.

### COMMONS.

This is a dining hall and eating room for men students of the University. It is conducted by the University, and the students pay just enough for board to pay the cost of furnishing the same to them. There

is no profit to the University in this dining hall, but, on the contrary, always, since it started, a deficit.

CLUB HOUSE KNOWN AS REYNOLDS CLUB.

This building is occupied as a general student club house. This club constitutes a part of the general scheme of education adopted by the complainant, its particular function and purpose being, in part, to cultivate the social side of the students, afford them wholesome recreation and elevating surroundings and keep them away from injurious associations and environments. It is used exclusively by students of the University and alumni as a club and contains rooms used for purposes usual in social club houses. Cer. tain of its rooms are also used for various student meetings and activities. The University authorities exercise general supervision over the running of the club. This club house was built with money donated to the University for the purpose of building, furnishing and equipping such a club house. The members pay nominal annual dues. The money realized from this source is not sufficient to pay for the running expenses and maintenance of the club.

LEON MANDEL ASSEMBLY HALL.

This is an auditorium in which various University exercises are held, such as chapel and commencement exercises, lectures, sermons, addresses, convocations, student debates, and other University exhibitions and entertainments.

ZOOLOGY, BOTANY AND RYERSON PHYSICAL LABORATORY BUILDINGS.

These are used by the University for the instruction of students in the sciences indicated by their respective names. They contain lecture halls, libraries and laboratories devoted to these subjects.

WALKER MUSEUM.

This is used by the University as a geological

museum. It contains the class rooms of the geological department and the museums and libraries used in connection with this department. It contains in addition the class rooms used by the department of anthropology.

## BEECHER, GREEN, KELLEY AND FOSTER HALLS AND FOSTER HALL ANNEX.

All of these are used by the University for dormitories for women. Women students at the University live and study in them during their attendance at the University.

## LEXINGTON HALL.

The rooms in this building are used by the University as class rooms for the instruction of women students in various University subjects, a part of said building being set off as a gymnasium for women students attending the University, and is under the control and supervision of the division of Physical Culture and Athletics.

## BUILDING KNOWN AS 55 TO 57 E. 59TH STREET AND AS THE PRESIDENT'S HOUSE.

This is occupied and used by the University as a residence for its president. One of the president's offices in which he transacts University business is situated in this building. The president also entertains visitors to the University at this house, and holds interviews with students and faculty, committee meetings, and commencements and other receptions there, and dispenses many other hospitalities incident to a University president's duties. Receptions to the students are also held there. The president pays no rent to the University for the use of this house, and the building is kept in repair by the University at its expense and under the direction of its superintendent of buildings and grounds. The lawn, walks, etc., about the house are all under the supervision of said

superintendent. Those in charge of the University consider that it is necessary for the president to reside at the University to properly attend to his duties as its president.

### COBB HALL.

This is a main lecture hall of the University. Its rooms are used as lecture rooms in various University subjects. This building also contains several departmental libraries, a University chapel and some of the University administrative offices.

### DIVINITY HALLS.

There are three of these halls used as dormitories for students in the Divinity School, which is one of the departments of the University. The rooms in the dormitory are used as living, study and sleeping rooms by such men students. These students pay no room rent, except a small sum sufficient to cover cost of heat, light and care of rooms, such as janitor service.

### HASKELL MUSEUM.

This building contains the chief administrative offices of the University, the faculty assembly rooms in which the meetings of the University faculty are held, the Oriental and Historical Museum used in connection with the work of the Divinity School, and the class rooms and libraries of the Divinity School.

### BUILDING KNOWN AS 5704 ELLIS AVENUE.

This is used by the University exclusively as a laboratory and lecture room for its psychological department.

### PRESS BUILDING.

This contains the general library of the University, offices of the secretary and auditor and business manager of the University, and a book store run by the University, where the students buy their student

books, also the University press department, which constitutes one of the five regularly constituted divisions of the University. This latter is run by the University and in it is printed all the stationery of the University, and all the University printed matter, such as catalogues, curricula, announcements, bulletins, programs, departmental journals, etc.

### BARTLETT GYMNASIUM.

This building contains all the appointments of an ordinary gymnasium, and is conducted by the division of Physical Culture and Athletics. It is designated and used for building up and developing the health of the students at the University. In it are carried on classes in physical culture, attendance at which is required of all the students at the University, and which classes are conducted by members of the faculty of the University appointed for that purpose. Students of the University also use this building for general exercising. The regular educational work of the University includes the study of physical culture and athletics.

### SCHOOL OF EDUCATION BUILDING AND MANUAL TRAINING SCHOOL BUILDING.

The former, occupying the south portion, and the latter the north portion of the block between 58th and 59th streets and between Monroe and Kimbark avenues, are occupied by the School of Education, University High School, the Elementary School, Manual Training School of the University of Chicago, and certain recitation rooms, offices of the faculty, and working rooms of the Manual Training and Domestic Departments.

### SCHOOL OF EDUCATION TEMPORARY GYMNASIUM.

This building contains all the appointments of an ordinary gymnasium. It is designed and used for building up the health of the students at the Univer-

sity, more particularly those attending the University High School, Elementary School and Manual Training School. It is used in the same manner as the Bartlett Gymnasium.

### LAW SCHOOL BUILDING.

This contains the Law Library of the University; the offices, class and lecture rooms and the general reading and study room of that department.

### POWER PLANT BUILDING.

This contains a power plant run by the University and used exclusively for supplying the other University buildings described in this paragraph with necessary heat, water and light. The heat and light are transmitted by a system of underground conduits. None of said other buildings have provisions of their own for heat and light.

### ELLIS HALL.

This is used by the University as a recitation hall for men in the Junior College, that is, in the first two years of the University.

### BUILDING KNOWN AS 5700 ELLIS AVENUE.

This is used for the office of the superintendent of buildings and grounds of the University and as a storeroom for material and tools used in connection with the administration of his office.

That the educational purposes of said University originally adopted and ever since maintained by it comprise the mental, moral and physical culture and training of its students; that for the accomplishment of these purposes said University has deemed it necessary to establish and has established the dormitories, together with the 'Commons,' hereinbefore described, in which the students are brought into immediate contact and under the direct influence of a member of the faculty residing therein and acting as the head

of each house into which said dormitories are divided. The ultimate purpose of the University is, as soon as circumstances permit, to increase the number of dormitories so that all of the students attending the University can reside therein, and to divide the students into small groups or houses in which they will be enabled to live as in a single family, under the direct influence of a member of the faculty as the head of the house.

That certain parts of the premises of complainant, hereinbefore referred to and described, that are not actually occupied by said buildings are laid out as walks, lawns and flower beds that during certain seasons of the year require water for sprinkling purposes; that all of said walks and lawns are reasonably necessary for use by complainant in the immediate conduct and carrying on of the educational purposes of its said institution.

That for the use and occupation of the rooms respectively occupied by them in the buildings herein described as Hitchcock Hall, Snell Hall, Beecher Hall, Green Hall, Kelley Hall, Foster Hall and Foster Hall Annex, and each of them, the occupants thereof pay to said University certain sums of money in addition to their regular fees for tuition, which said sums of money are, as hereinbefore stated, used by the University in defraying a part of its running expenses. These last named buildings are provided by the University for students who have no homes in Chicago, but who come from outside of Chicago to attend the University, and it is almost exclusively such students who occupy them. The students who occupy rooms in said buildings use their respective rooms as living and also as study rooms during the daytime and evenings, the University not providing study halls in which the students can prosecute their studies between classes. The University maintains control of and supervision over the student life in each one of these

last named buildings, by appointing some member of
the faculty, or some person associated with the faculty,
to live in said buildings and to oversee the student
life therein, there being one of said persons living in
each one of said buildings as its head. For all meals
served in the building described herein as the Com-
mons, the partakers thereof pay to said University of
Chicago certain sums in addition to their fees for tui-
tion, but, as stated above, such sums never exceed the
cost of the meals served.

Now, therefore, in consideration thereof, it is or-
dered, adjudged and decreed, and the court doth
hereby order, adjudge and decree as follows, to-wit:
That each and all of the hereinbefore mentioned prem-
ises, property and buildings, with the exception of
the premises hereinbefore referred to, upon which
it has been found that complainant has heretofore paid
water rates and taxes, are used in the immediate con-
duct and carrying on of the educational purposes of
said University of Chicago, complainant herein, and are
not used for gain or profit or rented, conducted, main-
tained or operated for the purpose of producing rev-
enue for said institution, and that under and by virtue
of the ordinances of the city, hereinbefore set forth,
complainant is entitled to have remitted and canceled
all of the water taxes and rates heretofore levied and
assessed against said premises, property and build-
ings, being the water taxes and rates in the bill of com-
plaint herein, as amended, referred to and described,
and also all water taxes and rates which may here-
after be levied and assessed against said premises,
property and buildings, or any of them, and against
such additions and accessions thereto as shall be used
by said University of Chicago in the immediate con-
duct and carrying on of the educational purposes of
its said institution, and as shall not be used for gain
or profit or rented, conducted, maintained or operated
for the purpose of producing revenue for such institu-
tion, so long as said ordinance of March, 1905, shall

continue in force, and said defendant, Patterson, as commissioner of public works of the city, and his successor or successors in office, is and are hereby directed to remit and cancel said water rates and taxes.

And it is further ordered, adjudged and decreed, that the defendant, City of Chicago, and the defendants, Patterson, as commissioner of public works, and Nourse, as superintendent of water of the said city, and their successors in office, and the agents and employes of each and all of said defendants, be and are hereby restrained from cutting off the city water from said hereinbefore mentioned premises, and from such additions and accessions thereto as shall be used by said University of Chicago in the immediate conduct and carrying on of the educational purposes of its said institution, and as shall not be used for gain or profit or rented, conducted, maintained or operated for the purpose of producing revenue for such institution, so long as said hereinbefore mentioned ordinance of March, 1905, shall continue in force."

We have set forth the entire decree because the decree is based on the facts found in it, and we think this necessary for an intelligent understanding of the case.

WILLIAM D. BARGE, for appellants; JAMES HAMILTON LEWIS, Corporation Counsel, of counsel.

JUDAH, WILLARD & WOLF, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

We shall consider only the contentions appearing in the argument of appellant's counsel, as objections not argued must be deemed waived. The first proposition of counsel is, that "it is not within the power of the city, by ordinance or otherwise, to give away its property." Three decisions of the Supreme Court

are cited in support of the proposition, each of which relates to property owned by a municipality in its public capacity, exercising governmental powers within the municipal bounds, as the agent of the state. There is a well-settled distinction between the power of a municipal corporation, in respect to such property, and its power in respect to property which it owns in a *quasi* private capacity. 1 Dillon on Mun. Corp., 4th ed., section 27. In Board of Park Commissioners v. Common Council of Detroit, 28 Mich. 228, the court, Cooley, J., delivering the opinion, say: "We also referred in People v. Hurlbut to several decisions in the Federal Supreme Court, and elsewhere, to show that municipal corporations, considered as communities endowed with peculiar functions for the benefit of their own citizens, had always been recognized as possessing powers and capacities and as being entitled to exemptions distinct from those which they possess, or can claim, as conveniences in state government. If the authorities are examined, it will be found that these powers and capacities, and the interests which are acquired under them, are usually spoken of as *private*, in contradistinction to those in which the state is concerned, and which are called *public*, thus putting these corporations, as regards all such powers, capacities and interests, substantially on the footing of private corporations," citing numerous cases. Ib. 237-8.

In Wagner v. City of Rock Island, 146 Ill. 139, 154, the court quotes with approval this language: "A municipal corporation which supplies its inhabitants with gas or water does so in its capacity of a private corporation, and not in the exercise of its powers of local sovereignty. If this power is granted to a borough or city, it is a special private franchise, made as well for the private emolument and advantage of the city as for the public good. In separating the two powers—public and private—regard must be had to the object of the legislature in conferring them. If

granted for public purposes exclusively, they belong to the corporate body in its public, political or municipal character; but if the grant was for purposes of private advantages and emolument, though the public may derive a common benefit therefrom, the corporation *quoad hoc* is to be regarded as a private company. It stands upon the same footing as would any individual or body of persons upon whom the like special franchises had been conferred."

Such being the law, the city was not without power to grant the exemption.

Counsel for appellants urge that the court's construction of the ordinance, in holding on the facts found, that the dormitories and commons are exempt, within the meaning of the sections of the ordinances quoted *supra,* is erroneous. As we understand the argument of counsel, this contention is based on two reasons: First, that the dormitories and "commons" are not within the words of the ordinances, that they are not used in the immediate conduct and carrying on of. the    *   *   *    educational purposes of such institution; and, second, that the dormitories and commons are "used for gain or profit."

Counsel in their argument say: "To us it is clear as anything can be, that the dormitories and restaurant (commons) mentioned in the bill and decree, are not used in the immediate conduct and carrying on of this school. The immediate conduct of an educational institution is nothing more than imparting that knowledge to students. The buildings that are used in the immediate conduct of an educational institution are those that are used as class rooms or study rooms, libraries or laboratories." Manifestly, this is too narrow a view. The language of the ordinance is not merely the conducting and carrying on of a school. The language is, "as is used in the immediate conduct and carrying on of   *   *   *   the educational *purposes* of such institution." In respect to the dormitories and commons, the court found as follows:

"That for the use and occupation of the rooms respectively occupied by them in the buildings herein described as Hitchcock Hall, Snell Hall, Beecher Hall, Green Hall, Kelley Hall, Foster Hall and Foster Hall Annex, and each of them, the occupants thereof pay to said University certain sums of money in addition to their regular fees for tuition, which said sums of money are, as hereinbefore stated, used by the University in defraying a part of its running expenses. These last named buildings are provided by the University for students who have no homes in Chicago, but who come from outside of Chicago to attend the University, and it is almost exclusively such students who occupy them. The students who occupy rooms in said buildings use their respective rooms as living and also as study rooms during the daytime and evenings, the University not providing study halls in which the students can prosecute their studies between classes. The University maintains control of and supervision over the student life in each one of these last named buildings, by appointing some member of the faculty or some person associated with the faculty, to live in said buildings and to oversee the student life therein, there being one of said persons living in each one of said buildings as its head. For all meals served in the building described herein as the commons, the partakers thereof pay to said University of Chicago certain sums in addition to their fees for tuition, but, as stated above, such sums never exceed the cost of the meals served."

There is no certificate of evidence in the record, therefore the facts found must be held to have been found by the chancellor on sufficient evidence. Brown v. Miner, 128 Ill. 148, 156; King v. King, 215 Ib. 100, 115.

Phillips Academy v. Andover, 175 Mass. 118, was an action by the academy to recover taxes paid under protest, on the ground that the property taxed was exempt from taxation. The statute under which the exemption was claimed provided: "The personal property of literary, benevolent, charitable and scien-

tific institutions, incorporated within this common-wealth, and the real estate belonging to such institu-tions, occupied by them or their officers for the pur-pose for which they were incorporated, shall be exempt from taxation.'' The court held that the academy was an institution within the meaning of the statute; and, in considering the words ''occupied by them or their officers for the purpose for which they were incorporated,'' say: ''It is not enough, for in-stance, that an income is derived from the occupancy which is applied to carrying on the institution. Chapel of the Good Shepherd v. Boston, 120 Mass. 212. At the same time the occupancy may be of the kind contemplated by the statute, notwithstanding that as incident to it rent is received, or the pecuniary value to the officer occupying is taken into account in some other manner. Massachusetts General Hospital v. Somerville, 101 Mass. 319. The distinction lies, it seems to us, between an occupancy which is for the private benefit and convenience of the officer, and which is so regarded by the parties, as in the ordinary case of landlord and tenant, and an occupancy where, although necessarily to some extent the relation of landlord and tenant enters into it, the dominant or principal matter of consideration is the effect of the occupancy in promoting the objects of the institution in the various ways in which such occupancy may or will tend to promote them. In the former case the property would not be exempt, in the latter it would; and the fact that the institution incidentally derived some pecuniary advantages from the occupancy, would not deprive the property of the exemption to which it otherewise would be entitled.

''In considering whether property is occupied so as to be exempt, regard may be had, amongst other things, to the situation of the institution. If, for in-stance, it is so situated that desirable residences are not or may not be easily obtained, and those in charge of it are of opinion that such officers as the best inter-

ests of the institution and of those resorting to it require, can be more easily obtained if the institution provides places for them to live in, and it does so, this may be taken into account in determining whether the occupancy is for the purposes for which the institution was incorporated. Or again, if with the best interests of the institution as an educational institution in view, and for the purpose of enhancing its advantages to students, and of promoting discipline and good conduct and greater freedom of intercourse between students and professors and instructors, those in charge deem it advisable that the president and professors and others connected with the institution should occupy residences in the college yard, or in proximity to the college buildings, this also may be taken into account. The dominant purpose of the occupancy under such or similar circumstances may be as truly for that for which the institution was incorporated, as the occupancy of buildings for recitation purposes, or for offices, or for other like purposes would be. And the occupancy does not lose what may be termed its institutional character and purpose because, as incidental to it, the officers and their families are provided with homes, for the use and enjoyment of which by them compensation is allowed, or taken into account in some manner. In many, if not most, New England colleges and academies the presence of the families of the professors and other officers has been and is regarded as beneficial to the students, and as advantageous to the institution. The occupation, therefore, by them as homes of the property belonging to such institutions, would not necessarily be inconsistent with the spirit and intent of the exempting clause.

"In considering the purpose of the occupancy, due weight is also to be given to the intentions of those in charge of the institution. The institution can only act through agents. In Massachusetts General Hospital v. Somerville, 101 Mass. 319, 322, it is said that

'what lands are reasonably required, and what uses of land will promote the purposes for which the institution was incorporated, must be determined by its own officers. * * * In the absence of anything to show abuse, or otherwise to impeach their determination, it is sufficient that the lands are intended for and in fact appropriated to those purposes;' and again, later, 'the presumption is in favor of their judgment, and it requires something more than mere difference of opinion, upon a matter of opinion especially confided to them, to overcome that presumption.' Their conclusions are not final. But if consistent with other facts tending to show that the purpose of the occupancy is that for which the institution was incorporated, they well may be allowed to have a controlling effect."

In Yale University v. New Haven, 71 Conn. 316, the statute relied on for exemption, being section 3820 of General Statutes, provided that "buildings or portions of buildings exclusively occupied as colleges," etc., should be exempt from taxation. The court, in its elaborate opinion, showing, historically and by reference to the customs of other colleges, what the word "college" includes, say: "All the dormitories occupied by students, the building used as a dining hall, the observatory buildings, the two houses furnished by the college for the officers of the observatory, the adjoining land found to be reasonably necessary for the purposes of the observatory, and No. 121 Elm street, used as a college yard in connection with the college buildings, are non-taxable property under section 3820." Id. 334. The court, in the same case say, in respect to the dormitories: "The fact that certain sums are paid for use of the rooms occupied, does not alter the character of the occupation. A church is none the less a church because the worshipers contribute to the support of services by way of pew rent," etc. Ib. 328. To the same effect are the following cases: Northampton Co. v. Lafayette College, 128

Penn. St. 132; Ramsey Co. v. Macalster College, 51 Minn. 437; Trustees, etc., v. State, 46 Ia. 275; Rural Cemetery v. Worchester County, 152 Mass. 408; State v. Ross, 24 N. J. L. 497; Academy of the Sacred Heart v. Irvey, 51 Neb. 755; Monticello Seminary v. The People, 106 Ill. 398.

The court found that the appellee, in addition to the regular tuition fees, charges the students who occupy the dormitories certain sums of money; and also charges the students who partake of meals served in the commons certain sums, in addition to the regular tuition fees; and counsel for appellants contend that these charges are gain or profit, within the meaning of section 2402 quoted in the statement preceding this opinion. It was evidently intended that section 2402 should have some effect as to educational institutions, and it must be so construed. But, if the contention of appellants is sound, the section can have no effect as to private educational institutions, because all such charge tuition fees, and appellants' contention is as applicable to tuition fees as to the charges in question. Therefore, appellants' contention cannot be sustained.

In Santa Clara Female Academy v. Sullivan, 116 Ill. 375, the academy was a corporation organized solely for educational purposes. It was objected that it was a corporation for pecuniary profit, in respect to which the court, after briefly stating the provisions of the academy's charter, say: "This is all—not a word as to stock, stockholders, dividends, or suggestive of pecuniary profit to anybody. It is said that fees are charged for tuition. We suppose this to be the case with all educational institutions, with hardly an exception, if any. What is meant by 'pecuniary profit,' is 'for the pecuniary profit of its stockholders or members,' in the words of section 26 (Rev. Stat. 1874, p. 290), before quoted. Such is not the purpose of this charter, but it is for educational purposes, and all the avails received are applied to the latter purposes. See McDonald v. M. G. Hospital, 120 Mass.

432, on this point. The proof is, 'there is no pecuniary profit to the members of the corporation from this institution. There are no dividends declared, no money given to any member. The trustees themselves derive no personal profit. The corporation is not conducted for any other purpose than educational and charitable purposes.' The record shows that the value of appellant's property but slightly exceeds the incumbrances and debts. That educational corporations are not corporations for pecuniary profit, is recognized by the law of this state in section 4, chapter 144, of the Revised Statutes of 1874, page 1090, which provides that any educational corporation theretofore incorporated under any special law of the state may 'become incorporated under the provisions of 'An Act concerning corporations,' approved April 18, 1872, relative to corporations not for pecuniary profit.' "

Section 4 of chapter 144, referred to by the court, is still in force. Hurd's Rev. Stat. 1905, p. 2032.

Our conclusions are that all the buildings mentioned in the decree are used in the immediate conduct and carrying on of the educational purposes of appellee, and materially subserve and promote said purposes, and that they are all exempt from water taxes and rates within the meaning of appellant's said ordinances, notwithstanding certain charges are made by appellee, in addition to the ordinary tuition fees, against students who occupy the dormitories, and against students who partake of meals at commons.

The decree will be affirmed.

*Affirmed.*